## Marcum et al. v. Wallace et al.

(Decided Nov. 25, 1932.)

L. G. CAMPBELL, W. H. MILLER and B. J. ELAM for appellants.

WILLIAM L. WALLACE and C. C. WALLACE for appellees.

OPINION OF THE COURT BY HOBSON, COMMISSIONER— Affirming.

H. F. Marcum and his son John Marcum, who was then not thirty years old, for several years prior to 1922, lived on what is known in the record as the Donaldson farm in Madison county as tenants, paying a rental of about $2,000 a year. In the fall of 1922 they purchased from George W. Phelps a neighboring farm containing 304 acres, at the agreed price of $100 an acre, amounting to $30,400. They paid Phelps then $5,000, and he executed to them a title bond by which the further sum of $5,000 was to be paid on January 1, 1924, and Phelps was then to make them a deed, they assuming a mortgage indebtedness of $10,000 to the Federal Land Bank and executing to Phelps six notes payable annually for the remainder of the consideration. They took possession of the farm, and, when the second payment of $5,000 was about due, they borrowed some money from others and then went to C. C. Wallace, who had been the attorney for Miss Donaldson in renting that farm and wanted to borrow from him $2,500 to make the payment to Phelps. Wallace was slow to lend the money but they assured him they had $3,500 on hand, and finally on January 31, 1924, he lent them the $2,500, taking their note therefor, due October 1, 1924, and a mortgage to secure the note on certain personal property and all their right, title, and interest in and to the land above referred to. The mortgage was acknowledged on that day before a notary public and was lodged for record on that day. On the same day they paid Phelps the $5,000, and Phelps made them a deed to the farm pursuant to the title bond. On September 8, 1924, the Marcums executed to the Home Tobacco Warehouse a mortgage for the sum of $2,000 on the tobacco growing on the place, and on the same day executed to C. C. Wallace a mortgage on the corn growing on the place to secure the note for $2,500, and also an additional sum of money which they then needed. On November 29, 1924, A. L. Noe, who held a note against the Marcums for $500, money borrowed some months before, brought an action in the Madison circuit court against the Marcums, C. C. Wallace, and the Home Tobacco Warehouse, praying that the above mortgages be adjudged preferential and to operate as a transfer of the property to all of the creditors.

After this suit was filed, on December 5, 1924, an order, as recited therein, was entered by consent, appointing C. C. Wallace as receiver for the property and he executed bond. Wallace then went out on the property to take charge of the personal property covered by the mortgage, a list of which had been made out by John Marcum. He could find only a small part of the personal property. A general attachment was taken out by Noe against the Marcums, but it was levied on nothing except a car owned by John Marcum and sold for about $25. On December 31, 1924, H. T. Marcum, his wife, and John Marcum executed a deed to Wallace for the Phelps land, he assuming to pay the liens upon it to the land bank and Phelps. The Marcums did not give possession to Wallace but remained on the property as his tenants under an agreement with John Marcum that within a year Wallace would convey the land to John Marcum if he would pay the lien debts and release Wallace. They remained on the farm until the end of the year 1925. At that time, being unable to make any arrangement under which they could hold the farm, they, in writing, released Wallace from his option and moved to Ohio. This was in December, 1925. After the deed was made to Wallace on December 31, 1924, Wallace made a settlement with Noe and that suit was dismissed, settled February 27, 1925. In December, 1929, the Marcums brought this action against Wallace charging in substance that the deed made on December 31, 1924, was obtained by fraud and that they signed it believing it to be only a mortgage and that it was then so read to them by Wallace. They also alleged that Wallace had taken charge of the property as receiver and was holding it as receiver, and that the deed he obtained in this way conferred no title on him personally, and that he took the property only as trustee for the parties to the action. They testified that they did not sell the property to Wallace and that this was never suggested at any time; that Wallace was their attorney and had been for some time; and that he obtained the papers by reason of the confidential relation between them.

On the other hand Wallace testified that he had never been their attorney, but, on the contrary, had been Miss Donaldson's attorney and had sued them for the rent on her farm. He also testified that the deed

was made by the Marcums freely because they saw no other way out of their difficulties, and he introduced a number of witnesses proving that the amount he agreed to pay for the land was the full market value at the time. He also showed that the Marcums owed other debts and were in a hopeless condition financially. They moved to Ohio when they gave up the land and he did not hear anything from them for some time. After this the highway commission undertook to build a state highway from Richmond to Winchester, which passed near this land, and, after this highway project became known and land had increased in value, this claim was set up and the suit brought. The circuit court on all the evidence dismissed the petition. The Marcums appeal.

The Marcums testify that they knew nothing of the action brought by Noe and did not sign the agreed order for the appointment of the receiver. Among the other signatures to this order is this: "H. T. Marcum & Son." The proof clearly shows that H. T. Marcum signed the paper himself, and then another, in his presence and with his consent, added the words "and son," as he said he could not write anything but his name. The mortgages and the deed were duly acknowledged before a notary public who testifies to the regularity of the proceedings and her testimony is not otherwise impeached. It is also confirmed by other witnesses, who testify to the same facts. By section 3760, Kentucky Statutes, the official certificate may not be called in question except upon the allegation of fraud in the party benefited thereby or mistake on the part of the officer. Clearly the proof here is not sufficient to show either of these. The subsequent conduct of the parties conclusively establishes the correctness of the proof for the defendant on these questions, and the judgment cannot be disturbed on the evidence.

Appellants earnestly insist that, as Wallace was receiver, the deed to him vested in him the title in trust for the parties to the action and that the trust may be enforced by them. In 53 C. J. p. 165, sec. 217, the rule is thus stated:

"As a general rule, a receiver will not be permitted, as receiver, to purchase property from himself in his personal capacity, nor to acquire for his personal benefit, directly or indirectly, pending the

receivership, any property committed to his custody or management, however free from fraud the transaction may be; but in a few instances such transactions have been permitted where they were clearly for the best interest of the estate.''

To the same effect see Titherington's Adm'r v. Hodge, 81 Ky. 286.

The equity rule as to all purchases made by a trustee from the cestuis que trustent that the purchaser holds the title in trust for them at their election is subject to other equity rules and will not be enforced when, upon the whole case, it would be inequitable to do so. One of the fundamental rules of equity is that equity aids the vigilant, not those who sleep upon their rights, and that equity refuses to enforce demands which the party has unreasonably delayed in asserting. 28 C. J. p. 193, sec. 179. If the Marcums had declined to surrender possession of the property to Wallace in December, 1925, and had then asserted the rights now claimed, an entirely different question would be presented. The receivership suit had been settled in January, 1925, and had been dismissed in February, 1925. They not only then surrendered the property to Wallace and moved to Ohio, but they had transferred to him the insurance policies on the buildings and also such rights as they had under the mortgage to the land bank. They very well knew that he was claiming the property as his own, and, in view of the financial difficulties surrounding them, then, without objection, not only released the option which he had given, but acquiesced in his claim to the property, as they were then in no condition to meet their obligations. After this, without any notice of any claim by them, Wallace went on treating the property as his own. He spent something like $4,000 on it in improvements and repairs. He paid the taxes past due; he made the payments as they fell due to Phelps and the land bank, and after all this was done and the Marcums had suffered it to be done, this suit was brought four years later asserting that Wallace's purchase was in trust for them. The fact is that Wallace was not only the receiver, but he was also the junior lienholder, and as a lienholder he took the deed in his own name, held possession in his own name, and the Marcums very well knew this. It is very doubtful if this suit would ever have been brought but for the

building of the turnpike, above referred to, and the consequent rise in value of land along it three or four years after the defendants surrendered everything to Wallace. In 39 Cyc. 371, the well-settled rule as to a purchase by the trustee from the cestuis que trustent is thus stated:

"While a trustee cannot purchase from himself, there is no rule of law to prevent him from purchasing the interests of the cestuis que trustent from them. Courts of equity scan such transactions closely, however, and require the trustee to take the burden of proof and overcome the presumption of fraud and undue advantage, arising from the transaction, by showing that the purchase followed a full disclosure of all information, that it was for a fair and adequate consideration, and was free from fraud. At the most, such a purchase is not void but merely voidable at the instance of the beneficiary alone, and then only upon the trustee being reimbursed for whatever sums he has paid out."

While a stricter rule is applied to a receiver, where he is in actual possession of the property or power to sell it has been conferred upon him, the rule in all cases as is well settled is this:

"If a cestui que trust, with full knowledge of a purchase by or in the interest of his trustee, and of his right to disaffirm it, elects to ratify such purchase, he is irrevocably concluded by such ratification, and the sale is thereafter not subject to successful assault at law or in equity. The cestui trust may, upon notice of all the facts, ratify and affirm the sale by his acquiescence or silent approval." 26 R. C. L. p. 1330, sec. 194. To same effect see 39 Cyc. p. 535.

In this case Wallace as receiver was not in possession of the land at any time. Marcum continued in possession and Wallace, as receiver, had no authority to sell or dispose of it. The Marcums not only acquiesced in the deed by accepting and holding the land under the option which Wallace gave John Marcum, but at the end of the year surrendered the option and moved away voluntarily. After this and when they were still acquiescing in the deed, Wallace paid the taxes, made the payments to Phelps and the land bank,

holding possession of the land by his tenants and improving it at a great expense, without any objection from the Marcums. Under such circumstances they are estopped to assert that Wallace held the land in trust for them, and the circuit court properly so held.

Judgment affirmed.